# Redd *v.* The State.

## Indictment for Murder.

1. *Sufficiency of indictment.*—An indictment which charges that the defendant, " unlawfully and with malice aforethought, did kill Lucy L. by strangulation, in this, to-wit, that he choked her to death," is sufficient under the provisions of the Code.

2. *Threats by accused against deceased.*—The evidence against the defendant as the guilty agent being entirely circumstantial, threats to kill the deceased, made by him at different times during the period of two years before the killing, are admissible evidence against him, as tending to show his feelings toward the deceased, though not connected with the killing; the probative force of such threats depending upon the circumstances under which they were made, their repetition, the lapse of time intervening between them and the killing, whether they were absolute or conditional, whether there were opportunities for carrying them into execution, and other like considerations, which affect their weight but not their admissibility.

3. *Same.*—A witness who passed the defendant and the deceased while walking together, a few weeks before the killing, may testify that he heard defendant say to deceased, " *You are a liar, you did do it, and I will kill you,*" though he did not hear any other part of the conversation between them.

4. *Declarations of defendant, not connected with killing.*—The defendant, a negro man, being indicted for the murder of a negro woman, and the evidence against him being entirely circumstantial, it is not permissible for the prosecution to prove his declaration, made a few days before the killing, but not shown to have had any reference to the deceased, " *that he did'nt mind killing a negro, if he fooled with him, any more than he would a buck rabbit.*" Such declaration, though it may indicate general malignity of heart, is irrelevant, and should not be received as evidence, unless it formed a part of the *res gestœ*, or was directly connected with the killing.

5. *Admissibility of confessions.*—The confessions of the accused, if made voluntarily, not being induced by hope or fear excited by others, are admissible evidence against him, though made while he was under arrest, to the officer having him in custody, and in response to inquiries addressed to him by the officer.

FROM the Circuit Court of Russell.

Tried before the Hon. H. D. CLAYTON.

[Redd v. The State.]

The indictment in the case charged, in a single count, that the defendant, John Redd, "unlawfully and with malice-aforethought, did kill Lucy Lee by strangulation, in this, to wit, that he choked her to death." There was a demurrer to the indictment, which the court overruled; and issue being joined on the plea of not guilty, the defendant was convicted of murder in the first degree, and sentenced to death. A bill of exceptions was reserved by the defendant during the trial, which states that "the defendant and said Lucy Lee were both negroes; no eye-witness to the killing was introduced, and there was no evidence of positive character tending to connect the defendant with the killing as the guilty agent." The dead body of the deceased was found in a well, on the 12th October, 1881, "with the head downward, and the feet upwards;" and Dr. Norwood, the first witness examined for the State, testified, "that the body rested on the head, and partly against the wall; that he examined the body, and found no marks of violence anywhere, except on the neck and face, and that these were slight, consisting of a swelling of the face and neck, some blood issuing from the ear, and some protrusion of the eyes; that the deceased came to her death, in his opinion, from strangulation, but the same marks described might possibly be produced by the inverted position of the body, and the shock of falling in that position." The other evidence adduced, and the several rulings of the court to which exceptions were reserved, are thus stated in the bill of exceptions:

"J. C. Chadick, the next witness for the State, testified, that he knew the defendant and Lucy Lee since 1878; that they were sweethearts that year; that the defendant told him Lucy was his sweetheart, but that he was not going to marry her; that the defendant married another woman in 1879, but still kept up his relations with Lucy; that he (witness) heard defendant say, in the spring of 1879, *he was going to kill Lucy if she did not stop talking to men;* that he heard him say about the same thing in the fall of 1879; that he knew of no more threats made by defendant against Lucy until in the spring of 1881; that in the spring of 1881, witness having paid some money to Lucy, at the request of one of his tenants, for day labor, defendant afterwards came to his field, and asked him if he had paid Lucy any money; that witness told him he had, and what it was for, and defendant then said, *That was all right, but if Lucy did not stop running after men, and getting money so he did'nt understand it, he would kill her;* that this was the last threat he knew of defendant making against Lucy; that they continued to be sweethearts afterwards, and that he saw them together once

[Redd v. The State.]

afterwards, during last spring, in the road. This being all the evidence of this witness on the subject of threats, the defendant moved the court to exclude said testimony as to threats from the jury, on the grounds that they were too remote, and that they were not shown to be continuing up to the time when Lucy came to her death; and, also, on the ground that they were conditional, and the conditions were not shown to have happened previous to the death of Lucy. The court overruled the motion, and the defendant excepted.

"Henry Morris, the next witness for the State, testified, that some time in September last, on Sunday, as he was coming from church, going to Wiley Bellamy's, he met the defendant and Lucy Lee walking along together, and heard the defendant say to her, *You are a liar, you did do it, and I will kill you;* that this was all he heard said between them, and he did not know what they were talking about; that the defendant did not kill Lucy at that time, nor try to kill her, and that he then had every opportunity to kill her, if he had wished to do so. The defendant objected to the testimony of this witness as to threats, on the ground that it was vague and uncertain, and unintelligible without the remainder of the conversation; but the court overruled the objection, and admitted the evidence; and the defendant excepted to this ruling.

"Warner Dawson, the next witness for the State, testified, that he heard defendant tell Lucy he was going to kill her; that this was at Wiley Bellamy's this fall—don't remember exactly when; that Jim Tate, Lucy's mother, and Richard Bellamy were there; that defendant called Lucy out, and asked her how long Jim had been there; don't remember what Lucy said, but defendant then told her he was going to kill her; and that after that time, about two weeks before Lucy's death, he saw them together at church. Susan Parsons, the next witness for the State, testified that, about one week before Lucy's death, she was walking in the road with Lucy and another woman, when defendant came up, and told Lucy to come and go with him—*that if she did not, he would cut her damned throat*; and that Lucy thereupon left her, and went with defendant. Caroline Tate, the next witness for the State, the wife of Jim Tate, testified that, about two months before this trial [November, 1881], defendant told her *that he would kill Lucy—that if she did'nt do him good, she would'nt do Jim any.* Joe Pitts, the next witness for the State, testified that, on Sunday before Lucy's death, he heard defendant say, *that he did'nt mind killing a negro, if he fooled with him, any more than he would a buck rabbit,* and that this was all defendant said. The defendant objected to the ad-

mission of this testimony, and moved to exclude it from the jury, on the grounds that it was irrelevant and illegal, vague and uncertain, and not shown to have any reference to the deceased. The court overruled the motion, and refused to exclude the evidence; to which the defendant excepted. John Pitts, the next witness for the State, testified, that he heard defendant say to Lucy, about one week before her death, that if she didn't do (?) to him, she would not do any body else any good—that he would kill her. This being all the testimony on the subject of threats, the defendant renewed his motion to exclude the testimony of the witness Chadick on the subject of threats, on the grounds hereinbefore mentioned; but the court overruled the motion, and refused to exclude said evidence; to which ruling the defendant excepted.

"The State then introduced some testimony tending to show that defendant sent a message to Lucy, on the day before she was found in the well, to meet him in a wood which was adjacent to said well; that said Lucy was last seen on that day going in the direction of said wood, and that the defendant was seen near said wood, about the same time. Ivy Doles was next introduced as a witness by the State, who testified, on cross-examination, that he, as deputy-sheriff of the county, arrested the defendant on the day the deceased was found in the well, and brought him to jail, a distance of about eight miles ; and that, while on the way to the jail, he asked the defendant many times, how many he did not recollect, whether he had killed the deceased or not. W. A. Tucker, a justice of the peace, who, in the absence of the coroner, held an inquest on the body of the deceased, testified, that he went with the defendant, while in the custody of the deputy-sheriff, over the ground where the killing was supposed to have been done ; that he asked the defendant at one point, *Is this the place where you killed her;* and at another, *Is this the way you carried her to the well?* Witness further testified, that on the Sunday morning after the defendant was lodged in jail, which was the Sunday after the alleged killing, he, being the jailor of the county, and having the defendant in his custody and keeping, went into the jail to look after the prisoners, and said to the defendant, *John, have you anything to say to me?* Defendant replied, *What, about that woman?* Witness replied, *Yes* ; and defendant then said : *1 killed her; but what I told you, when you asked me if that was the way I carried her to the well, was true. When I carried her to the well I went lower down in the field than you took me. I choked her near the well, and threw her in.* Witness made no threats, nor offered any inducements, to elicit

[Redd v. The State.]

this answer from the defendant, nor did anything tending thereto, except to ask the questions as stated. Said witness further testified, that the defendant knew of the gathering and action of a mob on Saturday and Saturday night previous to this confession. It was in evidence, also, that a mob of about one hundred and fifty persons had assembled not far from the jail, on the Saturday morning after the alleged killing, for the purpose of lynching the defendant; that the sheriff had applied to the probate judge for an order to remove the defendant to Union Springs in Bullock county, for safe-keeping against said mob; that a portion of said mob, consisting of twenty or more persons, had assembled on Saturday night, in the town of Seale, where is located the jail in which the defendant was confined, with the like purpose and intent; and that both of these assemblages had been dispersed by the sheriff, with the assistance of others, by remonstrances, appeals, and assurances that the defendant should be safely kept and tried. The defendant moved to exclude from the jury the confessions testified to by said Tucker, on the ground that they were not voluntarily made, because of the importunities and questioning of the officers who had the custody and control of the defendant, and because of the threats made by said mob, and the great fear engendered in the mind of the defendant by the conduct of said mob and the assembling thereof. The court refused to exclude said confessions from the jury, and the defendant excepted."

L. W. MARTIN, and J. B. MITCHELL, for the prisoner.

H. C. TOMPKINS, Attorney-General, for the State.

BRICKELL, C. J.—1. The indictment conforms substantially to the form prescribed by the Code, and, though omitting allegations deemed material at common law, under a long line of decisions must be deemed sufficient.

2. If there be error in the record, of injury to the appellant, it is to be found only in the exceptions reserved to the rulings of the court below in the admission of evidence. The first of these rulings refers to the admission of evidence of threats to kill the deceased, made by the accused at different times, through a period of two years, and some of them not unqualified, but stated conditionally. The force of the threat may affect its weight as evidence, while not rendering it inadmissible. Whatever may be its force, whether absolute or conditional, whether it indicates a purpose only contemplated, or fully matured, it is admissible in evidence, because indica-

[Redd v. The State.]

tive of the state of mind of the accused, and of the feelings he entertained or cherished towards the deceased.   The length of time elapsing between the making of the threat and the criminal act, when the crime is to be proved only by circumstantial evidence, is of importance in determining the weight to be accorded to it, as a circumstance connecting the accused with the commission of the criminal act, or as indicative of the state of his mind towards the person threatened.   If a long period intervenes, during which there were opportunities of doing the threatened injury, and there was no attempt to do it, and no repetition of the threat, it would be but a slight circumstance in connecting the accused with the injury, and there would be more reason for regarding it as having been a mere careless, thoughtless utterance, or idle bravado, or ebullition of temporary passion.   The length of time would impair its probative force, but would not render it inadmissible.—*Hudson v. State*, 61 Ala. 333 ; *Evans v. State*, 62 Ala. 6.   So, the probative force of the threat would be increased, if it was frequently repeated during the whole time intervening between its first utterance and the doing of the criminal act, and the same cause for ill-will and hate continued to exist. Then it could be imputed to a malignant spirit, and a purpose that may have been vacillating, but at last became fixed and settled.   The threat, like all declarations of criminal intention, tends to prove motives—to reveal purposes—and may be progressive steps to the consummation of a criminal act; and it is admissible as evidence, the weight of which the jury must determine, under appropriate instructions from the court.

3.   The declaration made by the accused to Lucy, but a few weeks before her death, including a threat to kill her, is not a partial or unfinished statement, though it is certain that it must have been preceded, and probably was succeeded, by other conversation which the witness did not hear.   In itself, it is an accusation against the deceased of falsehood, and a threat to take her life.

4.   The admission of the evidence of the witness Pitts, that, on the Sunday before Lucy's death, he heard the accused say, " that he didn't mind killing a negro, if he fooled with him, any more than he would a buck-rabbit," was erroneous.   All evidence ought to be responsive to the issue, and within the issue it is the duty of the court to confine the evidence. Facts and circumstances, which, when proved, can furnish no aid in determining the issue, can shed no light upon the transaction, or matter of inquiry, ought, in criminal cases, ever to be rigorously excluded.   Every fact, to which evidence is offered, may, in itself, become the subject of controversy ; and,

(32)

if controverted, opposing evidence must be heard. If the evidence was not limited,—if there was no rule, or principle, respecting its admission or exclusion, perplexing inquiries as to collateral or irrelevant facts would constantly arise, obscuring the real issue, confusing the minds of the jury, and embarrassing trials and the administration of justice. Parties would be oppressed, and would often suffer grievous wrongs; for it can not be supposed that they come prepared to meet any other evidence than such as is material to the issue. If the evidence be of their past conduct, or of their past declarations, it is only such conduct or declarations as have relevancy to the matter under inquiry, that it is fair, just or reasonable, to suppose they can be prepared to disprove, or to qualify, or explain, relieving them from all unfavorable inferences.

This declaration of the accused, coming, as mere oral declarations generally come, in a very questionable shape— an isolated expression, unaccompanied by any evidence of the circumstances under which it was uttered, by the conversation preceding it, by any evidence of the state of mind of the prisoner at the time of its utterance, is incapable of affording any aid or direction in the determination of any fact forming an element of the crime with which he is accused. It is not an expression of ill-will, or of hate to the deceased, nor a declaration of purpose to do her an injury. If it imports an unfriendly spirit, or a declaration of criminal intention, it is incapable of individualization—it is directed against a race, not a class of people, nor individuals of a class. It may indicate general malignity of heart; but evidence of that should not be received, unless its manifestations formed a part of the *res gestæ*, or were connected with it directly. A party ought not to be convicted of the offense with which he is charged, because he may have manifested a disposition to commit such offense; nor because he may have been, at some former time, guilty of, or even convicted of them; nor should he be convicted, because he may be of bad character—certainly not because he may have indulged in expressions indicative of an evil heart. The admission of this evidence may have prejudiced the minds of the jury against the accused—may have induced them to give to the evidence tending to criminate him a weight which otherwise ought not to have been accorded to it. In itself, it is irrelevant, too far removed from every inquiry involved in the issue before the jury.

5.   The confessions of the accused seem to have been voluntary, not induced by hopes or fears excited by others. That they were made while he was under arrest, or to officers of the law, or even elicited by inquiries addressed to him, did

[Collier v. The State.]

not require their exclusion.—*Carroll v. State*, 23 Ala. 28 ; *Franklin v. State*, 28 Ala. 9 ; *King v. State*, 40 Ala. 314.

For the error pointed out, the judgment must be reversed, and the cause remanded.    The prisoner will remain in custody until discharged by due course of law.